## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES WIERBOWSKI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>GEISINGER HEALTH and NUANCE COMMUNICATIONS, INC.,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff James Wierbowski ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, brings this Class Action Complaint against Defendants Geisinger Health ("Geisinger") and Nuance Communications, Inc. ("Nuance" and, with Geisinger, "Defendants"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters as follows.

## INTRODUCTION

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and Class members' personally identifiable information ("PII") and personal health information ("PHI"), including names, dates of birth, address, admit and discharge or transfer codes, medical record numbers, race, gender, phone numbers, and care location information.

2.      Geisinger is a healthcare provider serving urban and rural communities in Pennsylvania. Nuance is a provider of healthcare information technology services, and a third-party vendor for Geisinger.

3.      On or about November 29, 2023, Geisinger discovered that a former Nuance employee had accessed and acquired the PII/PHI of Plaintiff and Class members (the "Data Breach").

4.      Defendants promised Plaintiff and Class members that they, or the third parties they contract and share PII/PHI with, would implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PII/PHI against unauthorized access and disclosure. Defendants breached those promises by, *inter alia*, failing to, or sharing PII/PHI with third parties who failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach.

6.      Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

<u>**PARTIES**</u>

**Plaintiff James Wierbowski**

7.      Plaintiff James Wierbowski is a citizen and resident of Pennsylvania.

8.      Plaintiff obtained healthcare services from Geisinger. As a condition of receiving services, Geisinger required Plaintiff to provide it with his PII/PHI.

9.      Based on representations made by Defendants, Plaintiff believed that Defendants had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff provided his PII/PHI to Defendants in exchange for receiving healthcare services from Defendants.

10.      In connection with providing healthcare services to Plaintiff, Defendants collected, stored, shared, and maintained Plaintiff's PII/PHI on their systems, including the systems involved in the Data Breach.

11.      Had Plaintiff known that Defendants do not adequately protect the PII/PHI in their possession, he would not have agreed to provide Defendants with his PII/PHI or obtained healthcare services from Defendants.

12.      Plaintiff received a letter from Geisinger notifying him that his PII/PHI was exposed in the Data Breach.

13.      As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

**Defendant Geisinger Health**

14.      Defendant Geisinger Health is a Pennsylvania nonprofit corporation with its headquarters located at 100 North Academy Avenue, Danville, Pennsylvania 17822.

**Defendant Nuance Communications, Inc.**

15.     Defendant Nuance Communications, Inc. is a Delaware corporation with its headquarters located at 1 Wayside Road, Burlington, Massachusetts 01803. It may be served through its registered agent: Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     This Court has general personal jurisdiction over Defendant Geisinger Health because it is a corporation organized under the laws of this State, maintains its principal places of business in this State, regularly conducts business in this State, and has sufficient minimum contacts in this State.

18.     This Court has personal jurisdiction over Defendant Nuance Communications, Inc. because it regularly conducts business in this State, contracts to supply goods or services in this State, and has sufficient minimum contacts in this State.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Geisinger Health's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

20.     Geisinger claims to "serv[e] 1.2 million people in urban and rural communities across Pennsylvania."[1] Geisinger "generates $10 billion in annual revenues across 134 care sites - including 10 hospital campuses and Geisinger Health Plan, with 600,000 members in commercial and government plans."[2]

21.     Nuance provides healthcare technology services, including clinical solutions, diagnostic solutions, and revenue services.[3] Nuance's "AI-powered solutions" are used "by 77% of hospitals and 10,000 healthcare organizations worldwide" and "capture 300 million patient stories each year.[4]

22.     In the regular course of its business, Geisinger collects and maintains the PII/PHI of its current and former. Geisinger required Plaintiff and Class members to provide their PII/PHI as a condition of receiving healthcare services.

23.     Geisinger shared Plaintiff and Class members' PII/PHI with Nuance in connection with using services provided by Nuance.

24.     Geisinger provides its patients with a Notice of Privacy Practices (the "Geisinger Privacy Policy") which "describes how medical information about [patients] may be used and disclosed." Geisinger acknowledges it is "required to abide by the terms of this Notice."

---

[1] *Geisinger provides notice of Nuance's data security incident*, GEISINGER (June 24, 2024), https://www.geisinger.org/about-geisinger/news-and-media/news-releases/2024/06/24/18/17/geisinger-provides-notice-of-nuances-data-security-incident [hereinafter, the "*Data Breach Notice*"].
[2] *Id.*
[3] *See Healthcare AI Solutions & Services*, NUANCE, https://www.nuance.com/healthcare.html#standardpage-mainpar_multicolumn_33546632 (last accessed June 28, 2024).
[4] *Id.*

25.     The Geisinger Privacy Policy states "Geisinger may only use and disclose your PHI pursuant to an authorization, or as otherwise permitted or required by law." Geisinger says it will only use its patients' PHI for certain purposes, including treatment, healthcare operations, and billing and payment services.

26.     Geisinger states, "We are required by law to maintain the privacy and security of your PHI. We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."

27.     The Geisinger Privacy Policy claims Geisinger will only use or disclose patients' PII/PHI in ways other than specified in the Privacy Policy with a patient's "written permission or authorization."

28.     "Nuance collects personal data when we deliver our products, conduct marketing, and run our business operations."[5] Nuance "use[s] the personal data that is processed within our Products, such as . . . data within medical data products . . . and any personal data contained within product usage data we collect, to deliver our Products sold to Nuance customers."[6] "Nuance generally processes Product Personal Data on behalf of our healthcare, enterprise, and corporate customers."[7]

29.     Nuance represents that it "follow[s] generally accepted standards to protect the personal data submitted to us, both during transmission and once it is received."[8]

---

[5] *Nuance Privacy Statement*, NUANCE, https://www.nuance.com/about-us/company-policies/privacy-policies.html#collect (last accessed June 28, 2024).
[6] *Id.*
[7] *Id.*
[8] *Id.*

30.    Nuance claims it "manages your data responsibly and respectfully."[9] Nuance promises it "protects the privacy of the data we process . . . so you can trust the products and services you use every day."[10]

31.    Nuance acknowledges that "[m]aintaining the integrity and quality of Nuance data is critical to our clients' expectations as well as meeting legal and regulatory requirements."[11]

32.    Nuance admits its "clients trust Nuance to deliver solutions that handle patient data responsibly."[12] Nuance purports to "remain firmly committed to helping our clients comply with their data protection requirements.

33.    Nuance claims it "assesses our process, procedures, and systems on a routine and regular basis to ensure that updates and improvements are implemented to maintain our standards."[13] It further promises it "conducts training on at least an annual basis, and more frequently as needed, to ensure workforce members are aware of their roles and responsibilities related to data governance."[14]

34.    Nuance promises it "remain[s] firmly committed to helping our clients comply with HIPAA."[15] Nuance claims to evaluate its "products and product environments for," *inter alia*, "Encryption of data," "Restriction of physical access to production servers," and "Configurable administrative controls that allow customers to: Manage access control and authorizations at a

---

[9] *Protecting privacy to preserve your trust*, NUANCE, https://www.nuance.com/about-us/trust-center/privacy.html (last accessed June 28, 2024).

[10] *Id.*

[11] *Id.*

[12] Data governance program, NUANCE, https://www.nuance.com/about-us/trust-center/privacy/data-governance.html (last accessed June 28, 2024).

[13] *Id.*

[14] *Id.*

[15] *Health Insurance Portability and Accountability Act (HIPAA)*, NUANCE, https://www.nuance.com/about-us/trust-center/privacy/hipaa.html (last accessed June 28, 2024).

granular level," "Monitor and re-evaluate access rights," and "Obtain reporting and audit trails to account for both user and content activities audit trails to account for both user and content activities."[16]

35.    According to its website, "Beyond the customer-facing side of our healthcare solutions, Nuance embraces a holistic approach to securing patient data within our custody. We maintain and regularly review policies and procedures for the consistent application of appropriate and necessary controls."[17]

36.    Nuance claims this includes, *inter alia*, "Restricting access as appropriate and necessary to information assets," "Managing authorized user access as well as ensuring employee accountability for any unauthorized use or disclosure," and "Implementing cryptographic controls designed to protect the confidentiality, authenticity, and/or integrity of information."[18]

37.    Nuance states, "responsibility with respect to data privacy—including access and controls—is shared" with its clients.[19]

38.    Nuance promises it "maintains appropriate technical and organizational measures, through the implementation and enforcement" of certain policies, including:

**<u>Workforce Clearing, Training and Sanctions</u>**
All Nuance personnel are subject to background checks before access to restricted data is permitted. All personnel receive regular security training. Nuance has adopted policies and procedures to apply workforce sanctions to employees who fail to comply with Nuance security policies and procedures.[20]

* * *

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

**Access**
Nuance has located all equipment that stores Personal Data in controlled access areas. Nuance will only allow employees and contingent workers with a business purpose to have access to such controlled areas.

* * *

**Network Security**
Nuance has implemented appropriate supplementary measures to protect Personal Data against the specific risks presented by the Services. All data is protected by encryption in transit over open, public networks. Data at rest is protected either by encryption or compensating security controls, which include pseudonymization, segmented networks, tiered architecture, firewalls with intrusion protection and anti-malware protections, and limiting of port access. Personal Data is only retained for the duration required for regulatory purposes, unless otherwise outlined by the Services.[21]

39.     Plaintiff and Class members are, or were, patients of Geisinger, and entrusted Geisinger with their PII/PHI. Geisinger in turn shared Plaintiff's and Class members' PII/PHI with Nuance.

### *The Data Breach*

40.     On or about November 29, 2023, Geisinger "discovered and immediately notified Nuance that a former Nuance employee had accessed certain Geisinger patient information two days after the employee had been terminated."[22]

41.     Nuance failed to revoke the employee's access to sensitive patient information after the employee was terminated.[23] After being notified of the Data Breach by Geisinger, "Nuance

---

[21] *Description of technical and organizational measures*, NUANCE (Aug. 1, 2023), https://www.nuance.com/about-us/terms-and-conditions/previous-versions/2023/TOMs-2023-0801.html. Nuance has an updated version of their description of the technical and organizational measures it takes to secure PII/PHI as of April 1, 2024. *See* https://www.nuance.com/about-us/terms-and-conditions/data-processing-terms/TOMs.html. However, Plaintiff cites to the description in effect when the Data Breach occurred on or about November 29, 2023, though there are no differences in the relevant or material portions of the policies.
[22] *Data Breach Notice*, *supra* note 1.
[23] Andrea Fox, *Geisinger alerts patients to data incident involving terminated Nuance employee*, HEALTHCAREITNEWS (June 27, 2024), https://www.healthcareitnews.com/news/geisinger-alerts-patients-data-incident-involving-terminated-nuance-employee.

permanently disconnected its former employee's access to Geisinger's records."[24]

42.    An investigation into the Data Breach determined that personal information was affected in the Data Breach, including "names in combination with one or more of the following: date of birth, address, admit and discharge or transfer code, medical record number, race, gender, phone number and facility name abbreviation."[25]

43.    According to the data breach notice on Geisinger's website, "the former employee may have accessed and taken information pertaining to more than one million Geisinger patients."[26]

44.    The employee responsible for the Data Breach, Max Vance, was arrested two months after Geisinger discovered the Data Breach, and faces felony criminal charges.[27] Reports indicate the employee responsible for the Data Breach "had significant indicators of past and intended criminal conduct."[28] The article further reports:

> The detention order issued by the Southern District of California noted that law enforcement found firearms and ammunition in his home despite a restraining order prohibiting him from owning any firearms. They also found numerous false IDs with his photo and a variety of names, blank ID forms and machines to create IDs, paperwork related to prior crimes and the requirement to appear in court. Vance's history also revealed arrest warrants for failure to appear in court. Law enforcement also found a thumb drive in his car that contained "information from his former employer after he was fired."[29]

---

[24] *Data Breach Notice*, *supra* note 1.

[25] *Id.*

[26] *Id.*

[27] Dissent, *If the insider threat is at your vendor, could you discover it quickly?*, DATABREACHES.NET (June 25, 20240), https://databreaches.net/2024/06/25/when-the-insider-threat-is-at-your-vendor-could-you-discover-it-quickly/; Naomi Diaz, *Geisinger patient data compromised by IT vendor's ex-employee*, BECKER'S HOSP. REV. (June 25, 2024), https://www.beckershospitalreview.com/cybersecurity/geisinger-patient-data-compromised-by-it-vendors-ex-employee.html.

[28] *Id.*

[29] *Id.*

45.     While Geisinger discovered and notified Nuance of the Data Breach on or about November 29, 2023, Defendants did not begin to notify impacted breach victims about the Data Breach until approximately June 24, 2024, over six months after the Data Breach was discovered.[30] Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their PII/PHI will be misused and their identities will be (or already have been) stolen and misappropriated.

### Defendants Knew that Criminals Target PII/PHI

46.     At all relevant times, Defendants knew, or should have known, that the PII/PHI they collect, share, and maintain was a target for malicious actors. Indeed, Geisinger's Privacy Policy states they will alert patients in the event of a data breach. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized access that Defendants should have anticipated and guarded against.

47.     It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

---

[30] *See Data Breach Notice*, *supra* note 1.

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[31]

48.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Protenus found that there were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[32] This is an increase from the 1,138 medical data breaches which exposed approximately 59 million records that Protenus compiled in 2023.[33]

49.    PII/PHI is a valuable property right.[34] The value of PII/PHI as a commodity is measurable.[35] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[36] American companies are estimated to have spent over $19 billion on acquiring

---

[31] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[32] *See 2024 Breach Barometer*, PROTENUS 2, https://protenus.com/hubfs/Breach_Barometer/Latest%20Version/Protenus%20-%20Industry%20Report%20-%20Privacy%20-%20Breach%20Barometer%20-%202024.pdf (last accessed June 28, 2024).

[33] *See id.*

[34] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[35] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[36] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[37] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

50.    As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security Numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

51.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[38] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[39]

52.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[40] According to a report released by the Federal Bureau of

---

[37] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[38] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[39] *Id.*

[40] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[41]

53.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[42] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[43]

54.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[44]

55.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

56.    "One of the most important steps of tackling internal [data] security is understanding your own users, and their attitudes and behavior, in order to know the risks and

---

[41] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[42] Steager, *supra* note 38.

[43] *Id.*

[44] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Info. Sys. Rsch. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

mitigate against them."[45] Cyberattacks "do not always come from cybergangs or state-supported cyberterrorism. Insider threats increase with employee terminations, a phenomenon known as the termination gap."[46]

57.     The termination gap can result in former employees attempting "to steal sensitive data or sabotage systems."[47] A former employee who retains access to their former employer's network systems containing sensitive PII/PHI "may try to steal data or PHI from the organization, either to sell it on the black market or to use it for their own gain."[48]

58.     "When employee access is not disabled immediately upon their departure, organizations are putting their sensitive data at risk."[49] Therefore, it is "now more important than ever to have proper offboarding procedures and access policies in place."[50]

59.     "Former employees are probably the greatest insider threat, yet the easiest to address; just make changing passwords and deactivating accounts a part of the termination process."[51] The CERT Insider Threat Center at Carnegie Mellon's Software Engineering Institute recommends organizations combat the threat of insider data breaches by "Constrain remote work outside of normal hours," "Increase monitoring within a time window of a negative workplace event," "Monitor for insiders' machines using co-workers' accounts remotely," and "Eliminate

---

[45] Chris Bunn, *Do your ex-employees still have access to company data?*, ISDECISIONS (July 22, 2014), https://www.isdecisions.com/en/blog/insider-threats/a-third-of-ex-employees-accessing-company-data.
[46] Fox, *supra* note 23.
[47] Andrea Fox, *Cybersecurity: addressing the 'termination gap' and protecting data*, HealthcareITNews (Apr. 10, 2023), https://www.healthcareitnews.com/news/cybersecurity-addressing-termination-gap-and-protecting-data.
[48] *Id.*
[49] *Id.*
[50] Alyssa Borelli, *More Than A Third Of Former Employees Still Have Access To Company Data*, MYTECHDECISIONS (Feb. 10, 2020), https://mytechdecisions.com/network-security/more-than-a-third-of-former-employees-still-have-access-to-company-data/.
[51] Bunn, *supra* note 45.

potential methods of access after termination."[52] Other prevention strategies include "conducting regular user access reviews to ensure that employees only have access to the data and systems they need to do their jobs, and implementing robust provisioning, monitoring and alerting systems to detect unusual activity."[53]

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

60.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[54] [55]

61.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[56]

---

[52] CERT Insider Threat Center, *"Four Insider IT Sabotage Mitigation Patterns and an Initial Effectiveness Analysis" Paper Released*, SOFTWARE ENG'G INST. (May 14, 2014), https://insights.sei.cmu.edu/blog/four-insider-it-sabotage-mitigation-patterns-and-an-initial-effectiveness-analysis-paper-released/.

[53] Fox, *supra* note 47.

[54] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 28, 2024).

[55] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[56] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

62.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[57]

63.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[58] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[59] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [60] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[61]

64.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

        a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

---

[57] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed June 28, 2024).

[58] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[59] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 41.

[60] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed June 28, 2024).

[61] *Id.*

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [62]

65.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[63]

66.     It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

---

[62] *See* Dixon & Emerson, *supra* note 58.

[63] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

*Damages Sustained by Plaintiff and the Other Class Members*

67.    Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

68.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

69.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information and personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

70.    Plaintiff also brings this action on behalf of himself and all members of the following Subclass of similarly situated persons (the "Geisinger Subclass"):

> All persons whose personally identifiable information and personal health information was provided to Geisinger and was accessed in the Data Breach by unauthorized persons, including all such persons who were sent a notice of the Data Breach.

71.    Excluded from the Class are Geisinger Health, and its affiliates, parents, subsidiaries, officers, agents, and directors, and Nuance Communications, Inc., and its affiliates,

parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

72.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

73.    The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Geisinger's website data breach notice reports that more than one million patients were affected by the Data Breach.[64]

74.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.    whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b.    whether Defendants had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c.    whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d.    whether an implied contract existed between Class members and Geisinger, providing that Geisinger would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e.    whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

f.    whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

---

[64] *Data Breach Notice*, *supra* note 1.

g. whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

75.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

76.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

77.    Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff and his counsel have adequate resources to assure the interests of the Class will be adequately represented.

78.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense

to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

79.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.     Defendants owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in their possession, custody, or control.

81.     Defendants knew, or should have known, the risks of collecting, sharing, and storing Plaintiff's and Class members' PII/PHI, and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted companies storing PII/PHI in recent years.

82.     Given the nature of Defendants' business, the sensitivity and value of the PII/PHI they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems, including those relating to former employee access, and prevented the Data Breach from occurring.

83.     Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

84.     It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

85.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

86.     As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## <u>COUNT II</u>
## NEGLIGENCE *PER SE*

87.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88.     Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

89.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

90.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

91.     Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

92.     Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

93.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

94.     It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI

by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

95.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### *Against Geisinger*

96.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97.     Plaintiff brings this claim individually, and on behalf of the Geisinger Subclass, only against Defendant Geisinger Health.

98.     Plaintiff and Class members gave Geisinger their PII/PHI in confidence, believing that Geisinger would protect that information. Plaintiff and Class members would not have

provided Geisinger with this information had they known it would not be adequately protected. Geisinger's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Geisinger and Plaintiff and Class members. In light of this relationship, Geisinger must act primarily for the benefit of its current and former patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

99.    Geisinger has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by failing to, or contracting with companies that failed to, properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected and maintained.

100.    As a direct and proximate result of Geisinger's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Geisinger's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## <u>COUNT IV</u>
## BREACH OF IMPLIED CONTRACT
### *Against Geisinger*

101.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102.     Plaintiff brings this claim individually, and on behalf of the Geisinger Subclass, only against Defendant Geisinger Health.

103.     In connection with receiving medical or healthcare services, Plaintiff and Class members entered into implied contracts with Geisinger.

104.     Pursuant to these implied contracts, Plaintiff and Class members paid money to Geisinger, whether directly or through their insurers, and provided Geisinger with their PII/PHI. In exchange, Geisinger agreed to, among other things, and Plaintiff understood that Geisinger would: (1) provide medical or health services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations and industry standards.

105.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Geisinger, on the other hand. Had Plaintiff and Class members known that Geisinger would not adequately protect its current and former patients' or customers' PII/PHI, they would not have sought healthcare services from Geisinger.

106.     Plaintiff and Class members performed their obligations under the implied contract when they provided Geisinger with their PII/PHI and paid—directly or through their insurers—for health care or other services from Geisinger.

107.    Geisinger breached its obligations under the implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

108.    Geisinger's breach of its obligations of the implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

109.    Plaintiff and all other Class members were damaged by Geisinger's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk or imminent threat of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

**COUNT V**
**UNJUST ENRICHMENT**

110.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

111.    This claim is pleaded in the alternative to the breach of implied contract claim.

112.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to Defendants for healthcare services, either directly or indirectly, and through the provision of their PII/PHI.

113.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class Members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate payment.

114.    As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

115.    Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

116.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

### COUNT VI
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL")
### 73 P.S. §§ 201-1–201-9.3
### *Against Geisinger*

117.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    Plaintiff brings this claim individually, and on behalf of the Geisinger Subclass, only against Defendant Geisinger Health.

119.    Geisinger performs services in the Commonwealth of Pennsylvania.

120.    Plaintiff, Class members, and Geisinger are "persons" as defined by the UTPCPL. 73 P.S. § 201-2(2).

121.    Geisinger's healthcare and other services constitute as "trade" and "commerce" under the statute. 73 P.S. § 201-2(3).

122.    Geisinger obtained Plaintiff's and Class members' PII/PHI in connection with the healthcare and other services that Geisinger performed.

123.    Geisinger engaged in unfair or deceptive acts in violation of the UTPCPL by failing to implement and maintain reasonable security measures to protect and secure its patients' and former patients' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

124.    Geisinger makes explicit statements to its customers that their PII/PHI will remain private, as evidenced by the Geisinger Privacy Policy.

125.    The UTPCPL lists twenty-one instances of "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). Geisinger's failure to adequately protect Plaintiff and Class members' PII/PHI while holding out that it would adequately protect the PII/PHI falls under at least the following categories:

   a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have (73 P.S. § 201-2(4)(v));

   b.    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (73 P.S. § 201-2(4)(vii));

    c.   Advertising goods or services with intent not to sell them as advertised (73 P.S. § 201-2(4)(ix)); and

    d.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 P.S. § 201-2(4)(xxi)).

126.    Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII/PHI. Further, Geisinger's failure to adopt reasonable practices in protecting and safeguarding its customers' PII/PHI will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Geisinger's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

127.    As a result of Geisinger's violations of the UTPCPL, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Geisinger's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

128.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff seeks actual damages, $100, or three times their actual damages, whichever is greatest. Plaintiff also seeks costs, expenses, and reasonable attorney fees.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.     Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: June 28, 2024                              Respectfully submitted,

By:_____
Benjamin F. Johns (PA ID 201373)
**SHUB & JOHNS LLC**
200 Barr Harbor Dr., Suite 400
Conshohocken, PA 19428
Tel: 610-477-8380
bjohns@shublawyers.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff James Wierbowski*

**Pro hac vice* forthcoming